**CHEMICAL BANK, Plaintiff,**

v.

**A POCONO COUNTRY PLACE, INC., Defendant.**

**77 Civ. 2905(MEL).**

United States District Court, S. D. New York.

Aug. 13, 1980.

---

Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff.

Schnapper & Isaacson, New York City, for defendant.

LASKER, District Judge.

A Pocono Country Place, Inc. ("PCP") is a corporation engaged in the acquisition, subdivision, and sale of recreational real estate. Because few of those who purchased PCP's lots were able to finance them on a cash basis PCP arranged installment sales contracts for buyers. On January 25, 1973, PCP entered into a Developer's Agreement ("the Agreement") with Yegen Development Corporation ("Yegen") in which Yegen agreed to buy PCP's customers' outstanding notes and contracts. According to the terms of the Agreement PCP agreed, *inter alia*, to guaranty each payment and to assure that all Yegen's rights would inure to any financial institution which acquired those rights. The Agree-

ment did not require Yegen to inform PCP of customer defaults before acting on the guaranty.

From time to time thereafter Yegen sold its PCP contracts and notes to Chemical Bank ("the Bank") pursuant to a Land Finance Operating Agreement dated September 10, 1973. Under this contract the Bank acquired Yegen's rights in PCP's obligations and *vis a vis* PCP. The Bank agreed to perform normal inside collection activities on any obligations ten (10) days in default before referring the matter to Yegen for outside collection (at the Bank's discretion) or returning it to PCP for repurchase pursuant to the Agreement. There were never any direct transactions between the Bank and PCP.

The controversy in this case arises out of the Bank's efforts to collect from PCP on unpaid obligations of PCP's customers which the Bank acquired from Yegen pursuant to their contract. The Bank moves for summary judgment pursuant to Rule 56, Fed.R.Civ.P. The motion is granted.

\* \* \* \* \* \*

The Bank argues that because there were no direct relations between it and PCP (and even under the terms of the Bank's contract with Yegen) this case is controlled by the terms of the Agreement between PCP and Yegen and that because under that Agreement PCP unconditionally guaranteed all payments, it is therefore liable.

PCP answers that before it can be required to make up any defaulted obligations the Bank must follow the collection procedures delineated in its contract with Yegen. PCP alleges that many of the unpaid obligations were not paid because the buyers involved had never been informed of the assignment of their notes to the Bank, that the Bank didn't pursue collection activities and that the Bank did not notify PCP of the defaults or reassign the notes to them as a fallback. PCP argues that since the information needed to sustain its position is in the sole possession of the Bank, PCP should be given the opportunity to conduct discovery pursuant to Rule 56(f), Fed.R.

Civ.P.[1] PCP contends that if the Bank had notified it of the defaults, PCP's collection staff would have been able to collect on the defaulted obligations. The Bank responds that the Agreement between PCP and Yegen (which the Bank asserts to be controlling) did not require notice to be given.

\* \* \* \* \* \*

1. PCP has not yet begun discovery although the case has been pending for three years because it felt that to do so would be wasteful of both time and money in light of the possibility of settlement which existed up to the time of the instant motion.

*The PCP-Yegen Contract*

The Agreement between PCP and Yegen provided that PCP would "guaranty payment of each obligation. Upon breach of any warranty or guaranty hereunder, [PCP] shall, upon demand, repurchase the subject obligation from [Yegen] for an amount equal to the then unpaid balance. [Yegen] shall be under no duty to notify [PCP] of any default by an Obligor." (¶ 2) It further provided that "[i]n order to induce any Financial Institution to acquire Obligations from [Yegen], all of the terms hereof and undertakings, warranties and guaranties contained herein as well as those contained in any assignment of any Obligation shall also inure to the benefit of such Financial Institution and shall give to such Financial Institution the same rights as are conferred upon [Yegen]." (¶ 5)

We agree with the Bank that the plain and unambiguous language of these provisions endows the Bank with the right to demand payment from PCP on the installment payments the Bank bought from Yegen and that summary judgment is justified in this case. *Security Options Corp. v. Devilliers Nuclear Corp.*, 472 F.2d 844 (2d Cir. 1972); *Victory Container Corp. v. Sphere Insurance Co.*, 448 F.Supp. 1043, 1049 (S.D.N.Y.1978) ("Summary judgment is appropriate when the Court is faced with an unambiguous contract.")

*The Bank-Yegen Contract*

PCP opposes the Bank's motion based on a portion of the Bank's contract *with Yegen* which provides that "[w]hen an Obligation becomes ten [10] days in default, Bank shall perform normal inside collection activities including at least two (2) written communications with the Obligor. Thereafter, Bank may, at its sole discretion, refer the matter to [Yegen] for outside collection activity. If the default is not cured by the Obligor, [Yegen] shall tender the Obligation to [PCP] for repurchase in accordance with the Developer's Agreement." (¶ 4(a))

PCP argues that if it were granted the opportunity to conduct discovery of the Bank to ascertain whether the "normal internal collection activities" were performed and whether the obligors were notified of the assignment of their obligations to the Bank, information which is in the sole possession of the Bank, they would be able to show that the Bank failed to fulfill its obligations under its contract with Yegen. However, these arguments overlook the fundamental proposition that PCP was neither a party to the Bank-Yegen contract nor a beneficiary of it. The notification and collection provisions, and indeed the whole contract, appear to be calculated for the sole benefit of the Bank and Yegen. As quoted above, by its express language the contract provides that in the case of default PCP may be called upon to pay as guarantor.

\* \* \* \* \* \*

It is worth adding that Chemical Bank's argument that the policy underlying unconditional guaranties in developer's agreements is a major factor in inducing banks to participate in finance agreements is highly persuasive. The unconditional guaranty of the developer is clearly necessary to assure the confidence of a financial institution which buys a developer's notes. Without such guaranties the banks would not be interested in buying such paper. As a developer PCP must surely have been aware of this custom of the industry, and can reasonably be charged with intending to permit itself to be unconditionally liable in the event of a default of any of its customers. Without such an agreement on its part it undoubtedly could not have financed its projects.

The motion is granted.

It is so ordered.